UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| GINA MARIE COLE, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) No. 1:14-cv-01195-SEB-MJD ) |
| CAROLYN W. COLVIN Acting Commissioner of the Social Security Administration, | ) ) ) ) ) |
| Defendant. | ) |

**REPORT AND RECOMMENDATION**

Plaintiff Gina Marie Cole ("Cole") requests judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for Social Security Disability Insurance Benefits ("DIB") pursuant to the Social Security Act ("the Act"). For the reasons set forth below, the Magistrate Judge recommends that the District Judge **REVERSE** the decision of the Commissioner and **REMAND** the matter for further proceedings.

**I. Background**

Cole filed her application for DIB on April 28, 2011, alleging an onset of disability of March 2, 2011 due to various impairments including ocular third nerve palsy, bulging discs, headaches, anxiety, and fibromyalgia.[1] [R. at 162.] Cole's application was denied initially on

---

[1] Cole recited the relevant factual and medical background in her opening brief. [*See* Dkt. 15.] The Commissioner, unless otherwise noted herein, does not dispute these facts. [*See* Dkt. 18.] Because these facts involve Cole's confidential and otherwise sensitive medical information, the Court will incorporate by reference the factual background in the parties' briefs and articulate specific facts as needed below.

July 15, 2011 and denied on reconsideration on September 12, 2011. Cole timely requested a hearing, which was held before Administrative Law Judge Larry J. Butler ("ALJ") on May 30, 2013. The ALJ's December 31, 2013 decision also denied Cole's application for DIB, and on May 21, 2014 the Appeals Council denied Cole's request for review, making the ALJ's decision the final decision for the purposes of judicial review. Cole timely filed her complaint with this Court on July 17, 2014, which is now before the Court.

## II. Legal Standard

To be eligible for DIB, a claimant must have a disability pursuant to 42 U.S.C. § 416.[2] Therein, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i). In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis: (1) if the claimant is engaged in substantial gainful activity, she is not disabled; (2) if the claimant does not have a "severe" impairment that significantly limits her ability to perform basic work activities, she is not disabled; (3) if the Commissioner determines that the claimant's impairment meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, the claimant is disabled; (4) if the claimant is not found to be disabled at step three and she is able to perform her past relevant work, she is not disabled; and (5) if the claimant can perform certain other available work, she is not disabled. 20 C.F.R. § 404.1520.

---

[2] In general, the legal standards applied in the determination of disability are the same regardless of whether a claimant seeks Disability Insurance Benefits (DIB) or Social Security Income (SSI). However, separate, parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations of statutes or regulations found in the court decisions referenced herein.

In reviewing the ALJ's decision, the ALJ's findings of fact are conclusive and must be upheld by this Court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The standard of substantial evidence is measured by whether "a reasonable mind might accept [the evidence] as adequate to support a conclusion." *Powers v. Apfel*, 207 F.3d 431, 434 (7th Cir. 2000) (quoting *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995)). This court may not reweigh the evidence or substitute its judgment for that of the ALJ, but may only determine whether or not substantial evidence supports the ALJ's conclusion. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). The ALJ "need not evaluate in writing every piece of testimony and evidence submitted," *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993), but the ALJ must consider "all the relevant evidence," *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). In order to be affirmed, the ALJ must articulate his analysis of the evidence in his decision; he must "build an accurate and logical bridge from the evidence to [his] conclusion." *Dixon*, 270 F.3d at 1176

### III. The ALJ's Decision

The ALJ first determined that Cole meets the insured status requirements of the Act through December 31, 2011 and has not engaged in substantial gainful activity since her alleged onset date of March 2, 2011. [R. at 15.] At step two, the ALJ found that Cole has the following severe impairments, as defined by the Act: "left third nerve palsy, degenerative disc disease, and history of cervical discectomy and fusion surgeries." [R. at 15-16.] However, also at step two the ALJ found that Cole's fibromyalgia is not severe enough to significantly affect Cole's ability to perform basic work activities through the following reasoning:

> The claimant has alleged several medically determinable impairments which are non-severe. The medical records contain references to the claimant having a history of fibromyalgia. The claimant's medical records contain no signs, symptoms, or laboratory findings to support a diagnosis of Fibromyalgia, and the

3

> claimant's treating doctors gave no indication of its current existence. The other references to fibromyalgia in the record appear to be based on the claimant's self-reported history and are not supported by signs, symptoms, or laboratory findings. In fact, when asked how the claimant's fibromyalgia is being treated, she testified that she is trying to watch her diet to see if that helps.
>
> Dr. George Tzetzo performed and [sic] Internal Medicine Evaluation on the claimant on July 5, 2011, and commented that the claimant "thinks she suffers from fibromyalgia." After his physical examination he only diagnosed the claimant, with respect to this issue, as "fibromyalgia by history." Accordingly, the undersigned finds that the claimant's fibromyalgia does not significantly affect the claimant's ability to perform basic work activities and is therefore non-severe.

[*Id.* (internal citations omitted).] At step three, the ALJ then quickly found that Cole does not have an impairment or combination of impairments that meet or medical equal a listed impairment "of any section of Appendix 1." [R. at 16.]

After step three but before step four, the ALJ, after "careful consideration of the entire record," determined that Cole has the residual functional capacity (RFC) to perform "the full range of light work." [*Id.*] Specifically, the ALJ found that Cole can lift, carry, or pull up to twenty pounds occasionally and ten pounds frequently; can stand, walk, and sit about six hours each per eight hour work day each; and can perform all other hand and foot controls with no limitations. [*Id.*] In reaching this RFC, the ALJ relied on the following relevant conclusions and assertions in finding that "the medical evidence of record does not support [Cole's] allegations of disabling pain, symptoms and impairments": Cole is able to perform many daily activities, such as sitting in her backyard, listening to audiobooks, visiting her daughter, showering, and making sandwiches [R. at 18], Cole's defense that there is sparse medical treatment because she could not afford medical care should not be excused because she was aware of free and reduced cost health care and she could have applied for Medicaid [*id.*], Cole refused additional nerve block injections from Dr. Isaacson to help treat her chronic pain [R. at 19], and the records from Cole's

4

chiropractor are sporadic and chiropractors' opinions are not "medically acceptable" within the meaning of the regulations [*id.*]. The ALJ does not address Cole's allegations of fatigue except to state summarily that "[t]hough [Cole] alleges daily headaches, nausea, and fatigue, she is not being treated for these symptoms, and they do not prevent her from performing a wide range of activities of daily living." [R. at 20.] With regard to the weight of the evidence, the ALJ afforded significant weight to the opinion of Dr. George Tzetzo, generally assigned "controlling weight to the records and opinions of the treating physicians," generally accepted "the limited treatment records," and concluded that Cole is "not fully credible" because her statements are "inconsistent with the objective evidence." [R. at 21.]

Having concluded that Cole is capable of performing the full range of light work, the ALJ moved on to step four to determine whether Cole is capable of performing her past relevant work. [R. at 21.] Although her past relevant work as a receptionist is listed as semi-skilled work, the ALJ found that, because it is sedentary work that would not expose Cole to hazards and that would allow her to wear glasses, Cole is capable of performing her past relevant work as a receptionist. [R. at 21.] Accordingly, the ALJ decided that Cole was not disabled, as defined by the Social Security Act (SSA) from her alleged onset date of March 2, 2011 through her date last insured of December 31, 2011. [*Id.*]

### IV. Discussion

Cole asserts that the ALJ committed two pertinent errors in his decision: (1) the ALJ erred in his step-two analysis of Cole's fibromyalgia, which caused the ALJ to improperly conclude that Cole's fibromyalgia is not severe, and (2) the ALJ's step-two error is material because the ALJ then erroneously failed to consider the limitations caused by fibromyalgia during his assessment of Cole's residual functional capacity (RFC). [Dkt. 15 at 9, 17.]

5

**A. Step Two Error**

At step two, the ALJ must find that an alleged impairment is "severe" when it significantly limits the claimant's ability to perform basic work activities. 20 C.F.R. § 404.1521. In contrast, a non-severe impairment is one that is a "slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." S.S.R. 96-3p. Examples of basic work activities include physical capacities (such as walking, standing, and sitting), sensory capacities (such as seeing, hearing, and speaking), and mental capacities (such as understanding, judgment, and agitation). *Id.*

As in any step of the sequential disability evaluation, the ALJ at step two may not engage in impermissible "cherry-picking" of the medical evidence in order to support his findings. *See Yurt v. Colvin*, 758 F.3d 850, 859 (7th Cir. 2014). Additionally, the ALJ is prohibited from "playing-doctor" or "substituting his personal observations for considered judgments of medical professionals" at all stages of his decision. *See Turner v. Astrue*, 390 F. App'x 581, 584 (7th Cir. 2010).

Finally, with regard to fibromyalgia in particular, "[t]here are no laboratory tests for the presence or severity of fibromyalgia," so drawing a negative inference with regard to fibromyalgia on the basis of a lack of such tests is improper. *See Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996). Additionally, "[t]he principal symptoms [of fibromyalgia] are 'pain all over,' fatigue, disturbed sleep, stiffness, and . . . multiple tender spots," so the presence of such allegations in the medical record would qualify as signs and symptoms of fibromyalgia. *Id.*

Here, the ALJ based his finding that Cole's fibromyalgia is not severe on several erroneous conclusions. First, the ALJ wrote that Cole's "medical records contain no signs, symptoms, or laboratory findings to support a diagnosis of Fibromyalgia." [R. at 15-16.]

6

However, because no laboratory test can diagnose fibromyalgia, as seen in *Sarchet*, the latter portion of the ALJ's conclusions is erroneous on its face. Additionally, *Sarchet* clearly indicates that generalized pain, fatigue, and disturbed sleep are signs and symptoms of fibromyalgia, each of which is alleged throughout the medical record. [*See, e.g.*, R. at 421 ("generalized pain all over"), 426 ("abnormal sleep patterns with frequent wakenings [sic] throughout the night"), & 445 ("Chronic fatigue").] Accordingly, the ALJ's statement that no signs or symptoms of fibromyalgia are to be found in the medical record is an erroneous one, and his reliance on a lack of laboratory findings is additionally improper, pursuant to the Seventh Circuit's findings in *Sarchet*.

The ALJ additionally stated that "[t]he medical records contain references to the claimant having a history of fibromyalgia," but concluded that such references were insufficient to find Cole's fibromyalgia to be severe. [R. at 15.] The ALJ supports his conclusion of insufficiency by pointing out that Dr. Tzetzo, a physician who examined Cole at the request of the Commissioner, "**only** diagnosed the claimant, with respect to this issue, as 'fibromyalgia by history'" after noting that Cole "thinks she suffers from fibromyalgia" in discussing her chief complaints. [R. at 16 (emphasis added).] It is evident from the ALJ's treatment of these notes that, in the ALJ's opinion, Dr. Tzetzo "only" diagnosed Cole with fibromyalgia based on her self-reports. However, this is an example of the ALJ improperly substituting his own opinion for that of a medical professional, or, in other words, "playing doctor." The medical record, when taken on its face, shows that Cole's chief complaint was fibromyalgia and shows that Dr. Tzetzo diagnosed Cole with fibromyalgia, based on her history. [R. at 430-33.] The ALJ improperly determined that such a diagnosis was insufficient to find that an impairment is "severe" and in so doing played doctor, "substituting his personal observations for considered judgments of medical

7

professionals," as warned against in *Turner*. Thus, the ALJ erred in drawing a negative inference from Dr. Tzetzo's Internal Medicine Examination when evaluating the severity of Cole's fibromyalgia.

Finally, the ALJ additionally relies on his statement "when asked how [Cole's] fibromyalgia was being treated, she testified that she is trying to watch her diet to see if that helps" to conclude that her fibromyalgia is not severe. [R. at 16.] This statement is taken out of context, and Cole's complete response to the ALJ's question during the hearing reads as follows:

> ALJ: What are they doing to treat [your fibromyalgia]? Anything?
> Cole: Well, we're trying to watch my diet to help. That's to help, and just a lot of resting. I mean I cannot afford any – I've tried the medications. The first medication they've had me on did not work. They're very expensive.

[R. at 51.] Additionally, while this was Cole's testimony in response to the ALJ's questioning, there is also testimony from earlier in the hearing that is equally relevant:

> Attorney: You say you do have problems getting medical treatment [for your fibromyalgia], but you do get some medical treatment? [ . . . ] Where do you go for that? Who do you go to?
> Cole: An MD. Dr. Tgirski [PHOENETIC]. And then also chiropractic care when I can, and then I try to do what I can at home with a TNS unit and heat [about once a week]. Just resting.

[R. at 43-44.] Given that a wealth of relevant testimony was given at the hearing regarding the treatment of Cole's fibromyalgia (care from an MD, chiropractic care, at-home TNS unit treatment, rest, ineffective medication, expensive medication, and diet) but the ALJ chose only to recount Cole's testimony regarding her diet,[3] the Court finds that the ALJ additionally engaged

---

[3] On this point, the ALJ also draws a negative inference that changing one's diet is not a treatment for fibromyalgia. In her brief in support of her Complaint, Cole cites to sources indicating the contrary: that "[a] common thread in many cases of fibromyalgia seems to be a tendency to feel better when refined sugar, caffeine, alcohol, fried foods, red meat, and high processed foods, are kept to a sound personal minimum in the diet." [Dkt. 15 at 14-15 (citing to the National Fibromyalgia Research Association).] Being that it is no more permissible for this Court to play doctor than the ALJ, the Court will not weigh this evidence. However, the ALJ's conclusion that Cole "trying to watch her diet" is an indication that her fibromyalgia is not severe is yet another example of this ALJ impermissibly playing doctor. [R. at 16.]

in impermissible cherry-picking, as discussed in *Yurt*, in reporting that Cole only "testified that she is trying to watch her diet to see if that helps" in step two of his decision. Accordingly, the ALJ committed several errors in analyzing Cole's fibromyalgia and in concluding that it is not a severe impairment.

## B. RFC Assessment

An error at step two of the sequential evaluation is not necessarily *reversible* error, as a finding of just one severe impairment at step two requires the ALJ to continue to step three of the evaluation process. *Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010) (internal quotations omitted). However, the limitations caused by a claimant's impairments, both severe and non-severe, must be taken into account when the ALJ makes his assessment with regard to the claimant's residual functional capacity (RFC). *Farrell v. Astrue*, 692 F.3d 767, 772 (7th Cir. 2012). Thus, while a step two error is not itself reversible when the ALJ proceeds to step three, the ALJ must cure this error by properly evaluating all the relevant evidence when making his RFC assessment, analyzing the effects of all of the claimant's impairments, both severe and non-severe, "in combination." *See Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012); *see also Tolbert v. Colvin*, No. 1:11-CV-001530-SEB, 2013 WL 937819, at *3 (S.D. Ind. Mar. 7, 2013) ("the issue at step two *could* be rendered inconsequential as long as the ALJ considered the non-severe impairments with the severe impairments in determining whether [the claimant] could perform work at steps three, four and five"). Therefore, failure to evaluate the limitations caused by the impairments that were found to be non-severe in step two is reversible error, and a step two error thus raises a red-flag for such reversible error during an ALJ's RFC assessment.

Although the ALJ in this matter made several errors in his step-two analysis of Cole's fibromyalgia, as addressed above, such errors, on their own, are not reversible, as the ALJ found

9

other impairments to be severe and continued to steps three and four. However, such errors are not always cured, and the Court must look to the ALJ's treatment of the limitations caused by Cole's fibromyalgia in his RFC assessment to determine whether reversal is warranted. Specifically, in her briefing in support of her Complaint, Cole asserts that the ALJ failed to evaluate the functionally limiting pain and fatigue caused by her fibromyalgia. [Dkt. 15 at 17-20; Dkt. 19 at 4-5.]

Indeed, the ALJ mentions the word "fatigue" only once in his RFC assessment: "though [Cole] alleges daily headaches, nausea, and fatigue, she is not being treated for these symptoms, and they do not prevent her from performing a wide range of activities of daily living." [R. at 20.] While the ALJ fails to cite to any law, testimony, or medical record to evidence this conclusory statement [*id.*], that is not to say that no such law, testimony, or medical record exists. As discussed above, fatigue is a tell-tale symptom of fibromyalgia, *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996), so treatment for fibromyalgia would, therefore, constitute treatment of her fatigue. As noted above, Cole testified that, although certain medications did not work and were too expensive, she seeks chiropractic care, uses an at-home TNS unit, watches her diet, and rests in order to treat her fibromyalgia. [R. at 43-44 & 51.] Significantly, the need for "resting" as a treatment for her fibromyalgia is an indication that her fibromyalgia causes her fatigue. [R. at 44.]

The medical record also supports the assertion that Cole receives treatment for her fatigue caused by her fibromyalgia. Throughout 2012, Cole received treatment during over a dozen visits to a free pain clinic, receiving massage therapy, physical therapy, chiropractic care, and care from a "DO/MD." [R. at 441.] On her first visit to a free pain clinic in February of 2012, Dr. Gruning, DO (an osteopathic physician) noted that (1) Cole "goes to pain management when

10

[she] can afford it," (2) Cole's last neural block injection from Dr. Isaacson was three to four years ago, (3) Cole was diagnosed with fibromyalgia three years prior and has "pain all over" and "fatigue," and (4) Cole's sleep is poor due to her pain. [R. at 449.] In a Progress Note dated July 31, 2012, Dr. Gruning recorded, in relevant part, that (1) Cole was "not feeling well" and "tired," (2) although it helped when she had visited the chiropractor three weeks in a row, Cole was not able to go to the clinic that frequently because of the long distance from her home, (3) Cole's fibromyalgia and fatigue had increased (as indicated by an up arrow), (4) Cole was sleeping five to six hours each night, (5) Cole's diet was "just ok," (6) Cole was "taking all supplements," and (7) Cole remained diagnosed with "Chronic fatigue" and "fibro[myalgia]," [R. at 445.] Thus, the ALJ failed to acknowledge both testimony and recorded medical evidence confirming that Cole, when able, did seek medical care for her fatigue, as caused by her fibromyalgia.

Although the ALJ additionally concludes that Cole's fatigue does "not prevent her from performing a wide range of activities of daily living," the ALJ fails to build a logical bridge to this conclusion. [R. at 20.] As a part of his RFC assessment, the ALJ recorded the following daily activities:

> The claimant spends her days siting [sic] in her back yard getting fresh air, listening to audiobook tapes and talking to her bird. She also visits with [her] daughter, who will take her to the store, or she visits her father in the nursing home. She can care for personal needs if showering, but has to sit to get pants on because of her balance problems. The claimant can make sandwiches and soup, and [an] average day is [spent] watching television if she can see it. The claimant's driver's license has restrictions and she has to have additional side mirrors. She stated she drives once every few weeks and will go to the store or somewhere close.

[R. at 18.] The most active of these daily activities are showering and making sandwiches or soup, but the rest of Cole's typical day is spent sitting passively, either listening to audiobook

11

tapes, watching television, or riding in a car with a family member. In her brief in support of the ALJ's decision, the Commissioner further clarifies that Cole's family assists by vacuuming, dusting, washing the dishes, and going to the grocery store. [Dkt. 18 at 6 (citing to R. at 46).] The ALJ does not acknowledge this need for assistance, however, merely referring to the activities of which Cole is capable and concluding that they are a "wide range" of daily activities. [R. at 20.]

This is yet another example of the ALJ cherry-picking the evidence that might support a finding of non-disability, in violation of the standard set forth by the Seventh Circuit in *Yurt v. Colvin*. 758 F.3d 850, 859 (7th Cir. 2014); *see also Cagle v. Colvin*, No. 2:13-CV-391-JD, 2015 WL 416512, at *12 (N.D. Ind. Jan. 29, 2015) ("although the ALJ found that [the claimant] only suffered mild limitations in her daily activities [due to her pain and fatigue caused by fibromyalgia], he did not discuss the fact that many of her activities were restricted, that she needed breaks while completing tasks, and that she had to lay down for about half of the day with a heating pad due to her pain"). Additionally, the ALJ further fails to explain how the ability to shower and prepare sandwiches and soup is an indication that Cole's fatigue does not prevent her from performing a "wide range of activities of daily living." [R. at 20.] Such absence of explanation is a prime example of an ALJ's failure to "build an accurate and logical bridge from the evidence to [his] conclusion." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Thus, the ALJ erred in his RFC assessment, and this failure to properly evaluate the limiting effects of the fatigue caused by Cole's fibromyalgia constitutes reversible error, pursuant to the Seventh Circuit standard as set forth in *Farrell* and *Arnett*.

That is not to say that the ALJ did not discuss the limiting effects of any of the signs or symptoms of Cole's fibromyalgia, as the ALJ did discuss Cole's allegations of pain. However,

even in the analysis of Cole's pain as caused by her fibromyalgia, the ALJ errs. It is well-established law in the Seventh Circuit that an ALJ is prohibited from drawing a negative inference from a lack of medical care when the claimant has "good reasons" for sporadic treatment, including but not limited to the inability to afford treatment, ineffectiveness of further treatment, or intolerable side effects of treatment. *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012). In his RFC assessment of Cole, the ALJ draws two such negative inferences: (1) the ALJ concludes that Cole's chronic pain is not limiting because she declined an additional "neuro-block nerve injection" from Dr. Isaacson in 2010, and (2) the ALJ concludes that Cole's chronic pain is not limiting because she received only sporadic care from the free pain clinic and another chiropractor from 2012 through 2013.[4] [R. at 19.] In response to the ALJ's questioning at the hearing, the ALJ's decision reviews that Cole testified that "her limited medical treatment has been because she cannot afford to see doctors." [R. at 18.]

The ALJ does not accept Cole's lack of funds as a "good reason," however, because "she was aware [of] free and reduced cost health care [at the free pain clinic]. She also could have applied for Medicaid." [*Id.*] With regard to Cole's awareness of the free pain clinic, the record reflects that it was difficult for Cole to get to the clinic, presumably due to her driving restrictions as well as the long distance from her home. [*See* R. at 445.] Additionally, the ALJ and the Commissioner fail to present any authority, and the Court is aware of no such authority, that requires a claimant to seek Medicaid in order to be sheltered from the negative inference regarding her inability to afford medical care. [*See* Dkt. 18.] On the contrary, courts have found

---

[4] The ALJ's decision notes that "there are no further medical records pertaining to [chiropractor Dr. DiTommaso]" after May 31**, 2012**. However, the record indicates that the visit occurred on May 31, **2013**, the day after Cole appeared for her hearing before the ALJ, which records were submitted to the ALJ on June 3, 2013. [R. at 505.] Accordingly, the Court refers to the treatment as continuing through May of 2013 and not ending in May of 2012, as the ALJ incorrectly concluded.

13

negative inferences improper when the claimant does not have, or has even been denied, Medicaid. *See, e.g. Diamond v. Colvin*, No. 1:14-CV-00114-TAB, 2015 WL 328880, at *4-5 (S.D. Ind. Jan. 23, 2015) (finding that the ALJ improperly "drew a negative inference from Diamond's alleged symptoms without considering Diamond's financial situation and inability to pay for medical care" even though "he was denied Medicaid"); *Delgado v. Colvin*, No. 3:12-CV-53 JVB, 2013 WL 2431160, at *7, *17 (N.D. Ind. June 4, 2013) (finding that the ALJ erred in drawing a negative inference from the claimant's failure to follow through on medical treatment when the claimant testified that she "does not have Medicaid and cannot afford the co-payment"). Thus, the ALJ erroneously drew negative inferences from Cole's sporadic treatment of her pain, ignoring the "good reasons" that she was unable to afford the medical care she needed and she did not have adequate access to the free pain clinic, and the decision of the ALJ should be reversed on this ground as well.

Finally, the ALJ improperly dismissed the treatment records from the free pain clinic and from Dr. DiTommaso, DC, stating that "Chiropractors do not hold medical degrees, and for the purposes of making a determination of disability within established federal guidelines, their opinions are not considered 'medically acceptable' within the meaning of the regulations." [R. at 19 (citing to 20 C.F.R. § 404.1427).] Although there seems to be no relevant section 404.**1427** as cited by the ALJ, 20 C.F.R. § 404.**1527** states, in relevant part: "Medical opinions are statements from physicians and psychologists or other **acceptable medical sources** that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." Social Security Ruling 06-03p clarifies that examples of medical sources who are not "acceptable medical sources" include nurse practitioners, licensed clinical social

workers, and chiropractors. This distinction is significant because only an "acceptable medical source" can establish the existence of a medically determinable impairment, can give the Commissioner a medical opinion, and can be considered a treating source. S.S.R. 06-03p.

However, evidence from "other sources" may be used "to show the severity of the individual's impairment(s) and how it affects the individual's ability to function." *Id.* In fact, "depending on the particular facts in a case, and after applying the factors for weighing opinion evidence . . . it may be appropriate to give more weight to the opinion of a medical source who is not an 'acceptable medical source' if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion." *Id.* Such factors, as listed in 20 C.F.R. § 404.1527 and in Ruling 06-03p, include the examining relationship, the treatment relationship, supportability, consistency, specialization, and any other factors "that tend to support or refute the opinion." *Id.* Thus, it is improper for an ALJ to disregard evidence from a medical source that is not an "acceptable medical source" without first applying the factors set forth in 20 C.F.R. § 404.1527(d) and explaining why the medical opinion has been disregarded. *See, e.g.*, *Phillips v. Astrue*, 413 F. App'x 878, 884 (7th Cir. 2010) ("[i]n deciding how much weight to give to opinions from these 'other medical sources,' an ALJ should apply the same criteria listed in § 404.1527(d)(2)"); *Dogan v. Astrue*, 751 F. Supp. 2d 1029, 1039 (N.D. Ind. 2010) ("[t]he ALJ erred in failing to apply these [§ 404.1527(d)] factors to [the nurse practitioner's] opinion"). No matter the source of the evidence of record, the ALJ must make his RFC assessment based on **ALL the relevant evidence** in the record." *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (emphasis added).

Here, the ALJ's sole remaining explanation[5] for disregarding the treatment from the free pain clinic and Dr. DiTommaso, a chiropractor, is because the opinions of chiropractors "are not considered medically acceptable." [R. at 19.] This explanation, however, directly contradicts Ruling 06-03p in that the Ruling requires the ALJ to consider the opinions of "other medical sources" using the factors listed under 20 C.F.R. § 404.1527(d) before disregarding such relevant opinions. When the ALJ refuses to do so, the proper recourse is to remand the case for further consideration, pursuant to *Phillips* and *Dogan*. Additionally, the ALJ's failure to give proper consideration to the chiropractic records because of their source is a refusal to base his RFC assessment on "all the relevant evidence in the record," which requirement is emphasized in *Young*. Therefore, even if the ALJ had not failed to properly evaluate the limiting effects of the fatigue caused by Cole's fibromyalgia, the ALJ additionally committed reversible errors in disregarding the medical treatment sought by Cole to treat her fibromyalgia during his RFC assessment. Accordingly, the Court should **REVERSE** the decision of the Commissioner and **REMAND** the matter for further consideration not inconsistent with this report and recommendation.

## V. Conclusion

For the aforementioned reasons, the ALJ committed reversible error in his assessment of the Plaintiff's residual functional capacity, in addition to his underlying error in assessing her fibromyalgia in step two. The decision of the Commissioner should therefore be **REVERSED AND REMANDED** to the Social Security Administration for further proceedings consisted with

---

[5] The ALJ additionally found the treatment to be sporadic, which finding the Court has addressed above, and the ALJ also incorrectly indicated that there were "no further medical records pertaining to [Dr. DiTommaso]" after May 31, **2012** [R. at 19] when the actual medical record is dated May 31, **2013**, the day after the hearing on this matter, just prior to the close of the record [R. at 505]. Accordingly, the Court will refrain from addressing this error again.

this opinion. Additionally, the District Judge should **ORDER** that the matter be assigned to a new administrative law judge on remand. Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), and failure to timely file objections within fourteen days after service shall constitute a waiver of subsequent review absent a showing of good cause for such failure.

Date: 04/01/2015

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Timothy J. Vrana
tim@timvrana.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov